## COMMONWEALTH *vs.* INHABITANTS OF DEERFIELD.[*]

The question how far the ways constituting the approaches to a bridge are included within the franchise of the corporation which is bound to maintain it, if there is nothing in the statute creating the franchise to define the extent of the bridge in this respect, must be determined by a consideration of what is reasonable under the circumstances; and this may be fixed by the practical construction which has been applied in the exercise of the franchise by its owners, with the acquiescence of the public.

If a flood in a river has washed away a part of its banks, and widened the bed of the stream, the obligation of the corporation having the franchise of a toll-bridge across the river to maintain and keep its bridge in repair will require the extension of the bridge to the new bank thus created, if there is no other limitation of the franchise.

If at the place where a bridge joins the land, the earth has been washed away, continuously from the edge of the bank as it formerly existed, to the depth of fifteen or twenty feet, and down to the solid rock, by a flood, so that a precipitous bank of earth is left at the termination of the road which remains, in a line with the general river bank on that side, with only a projecting point of rock beneath, the court cannot determine as a matter of law that these facts do not prove a widening of the bed of the river, but the question should be submitted to the jury.

If a town has neglected to repair a part of a road which it was its duty to maintain, it is no defence to an indictment for the neglect, to show that this part would be of no immediate practical use, because a portion of a bridge with which the road connects, and which the town is not obliged to maintain, has been swept away and not rebuilt.

INDICTMENT for a neglect to repair a portion of two highways, leading to the bridge of " The Proprietors of the Connecticut River Bridge" across the Connecticut River, between Deerfield and Montague.

At the trial in the superior court, before *Vose*, J., it appeared that at the place where the bridge was built the bank of the river on the west or Deerfield side projected out into the stream, so that at that point the river was narrower than it was at a short distance above or below the bridge ; and that at a distance of about fifty feet from the west end of the wood structure of the bridge the two roads leading to it united, one of them approaching the bridge from the northwest, and the other from the southwest, with a cross road running between them intersecting with the upper road at a point about one hundred and seventy

---

[*] This case and the two following cases were argued at Boston, in January 1864, before all the judges except METCALF, J.

feet from the bridge, and with the lower road at a point about one hundred and forty feet from the bridge. In March 1862 by an unusual freshet the bank at the west end of the bridge, to the distance of about one hundred and sixty feet, including the cross road, was swept away, leaving an excavation from fifteen to twenty feet in depth, which extended down to a solid stratum of rock, and had at the westerly side an abrupt and precipitous bank, about ten feet west of where the cross road had been. This stratum of rock continued from the westerly abutment of the bridge into the bank at the westerly side of the excavation, and was swept clear of all the earth and materials upon it, except the westerly abutment of the bridge. A few trees also remain standing below this abutment. The excavation also extended about twenty rods below the bridge.

The upper highway leading to the bridge was established in 1832 upon the site of the Fifth Massachusetts Turnpike, without mention of any chartered rights of the Proprietors of the Connecticut River Bridge; and the lower highway was established by user alone. The evidence was conflicting whether the defendants had ever repaired either of these highways between the cross road and the bridge, and the jury found specially that they had not. The bridge corporation have at various times caused work to be done upon both of these roads, for the purpose of preventing the water from breaking through them; and several years ago they raised the superstructure of their bridge about four feet, and graded up the road, so as to make a convenient entrance upon the bridge. The defendants did not deny their obligation to repair the highways to the respective points of intersection with the cross road.

In high water the main current of the stream is on the westerly side, and directly towards the west abutment, and the bank has for many years been gradually wearing away, and the water, before the freshet of March 1862, at a short distance both above and below the bridge, extended several rods further west than the westerly end thereof. The evidence also tended to show that the freshets of Connecticut River, as they have occasionally occurred of late years, have been higher than those of former

times, each succeeding freshet being greater than any preceding one; and it appeared that the freshet of March 1862 was the highest ever known, and rose some three feet upon the superstructure of the bridge, and there was not room for the water of the river to pass between the abutments, and the water crossed the roads at each end of the bridge, and, after the westerly bank had been washed away, continued to flow through the excavation for about four weeks, but has not since run into the same except in two days in October 1862, when there had been heavy rains. The bottom of the excavation is higher than the ordinary stage of the water in the river during the summer.

It appeared that the safest and most practicable mode of repairing the ways across the excavation is by a bridge, which would cost $2680; and that to build solid masonry across it would cost much more. The Proprietors of the Connecticut River Bridge were incorporated by *St.* 1796, *c.* 24, and the Fifth Massachusetts Turnpike by *St.* 1798, *c.* 85.

The defendants requested the court to instruct the jury as follows:

" 1. If from natural causes, without default of the town, the ways complained of have been entirely destroyed by being washed away to such a depth that the place where such ways were is now a part of the natural channel of the river, so that nothing remains of said ways to be repaired, then the allegation that there are such highways out of repair is not supported.

" 2. The charter of the bridge corporation authorizes and requires said corporation to erect and support a bridge across Connecticut River. This authority and duty extend to the changes in the course and beds and banks of the river from natural causes, whether it be by excessive floods producing violent and visible alterations, or by imperceptible wear of the water.

" 3. The bridge corporation had by their charter all the incidental powers necessary for the permanent safety, support and maintenance of their bridge; and this includes the right of controlling all the lands upon the western bank of the river, which are reasonably necessary for this purpose ᵃⁿᵈ the defendants

are bound only to repair the ways up to the lands controlled by the bridge corporation.

" 4. The obligation of the town to repair is suspended until the bridge corporation shall repair that portion of the ways which belongs to it to repair.

" 5. If the site washed away has become a necessary part of the channel of the river from natural causes, or from natural causes as affected by the authorized structure of the bridge, the defendants are not under obligation to repair it."

The judge declined to give these instructions, and instructed the jury that, upon the foregoing evidence, it was the duty of the defendants to rebuild or repair the highways alleged to be out of repair, in consequence of said excavation. The jury returned a verdict of guilty ; and the judge reported the case for the determination of this court.

*D. Aiken,* for the defendants. The main question in this case is, Where is the boundary indicating the limits of the obligation of the bridge corporation and of the defendants to make repairs respectively ? The former were by their charter authorized " to erect a bridge over Connecticut River, from the western shore to Montague." *St.* 1796, *c.* 24. These limits are uncertain on both sides. By the common law of England, the road for three hundred feet at each end of a bridge is to be taken as a part of the bridge. *St.* 22 Hen. VIII. *c.* 5. The definition of " bridge " includes the approaches. *The King* v. *West Riding of York,* 7 East, 588, 595, 599. *West Riding of York* v. *The King,* 5 Taunt. 284. Woolrych on Ways, 78, 199, 229, 238. Angell on Highways, § 40. *Regina* v. *Hornsea,* 25 Eng. Law & Eq. R. 582. *The State* v. *Canterbury,* 8 Fost. (N. H.) 230. *Bardwell* v. *Jamaica,* 15 Verm. 438. This doctrine is adopted in *Freeholders* v. *Strader,* 3 Harrison, (N. J.) 108. This bridge corporation has acted on the same principle, and appropriated and repaired the ways leading to the bridge. See Gen. Sts. *c.* 44, § 26. *Parker* v. *Boston & Maine Railroad,* 3 Cush. 116, 117. *Sawyer* v. *Northfield,* 7 Cush. 496. *Lakin* v. *Ames,* 10 Cush. 198. The omission to build a bridge will not sustain this indictment; nor the omission to repair the short distance west of the cross

road, while the remaining portion was unrepaired. *The State* v. *Canterbury*, 8 Fost. (N. H.) 230. 3 Chit. Crim. Law, 593. The duty of the bridge corporation is, to follow the course of the water. *The King* v. *West Riding of York*, 7 East, 599. *Hopkins Academy* v. *Dickinson*, 9 Cush. 544. And a structure which merely spans the width of a stream, but is inaccessible at one end, is not a bridge. The judge erred in assuming to judge of the facts, and directing a verdict as in a civil action.

*G. T. Davis*, for the Commonwealth. The defendants are bound to maintain these roads. The upper road was laid out as a highway in 1832. They are also liable on the ground of user. Gen. Sts. *c.* 44, § 26. *Jennings* v. *Tisbury*, 5 Gray, 73. *Hayden* v. *Attleborough*, 7 Gray, 344. The charter of the bridge corporation gave merely the power to erect and maintain a bridge, but not to take land. Having erected the bridge many years ago, according to their charter, their duty was fulfilled, and no subsequent changes in the banks or bed of the river impose on them new duties. This corporation was not a public body, and is not liable to the duties which are properly imposed on public bodies, which have a right to take land. The rights and liabilities of parties remain unchanged, when a bank is suddenly and violently washed away. Angell on Watercourses, § 57. *Hopkins Academy* v. *Dickinson*, 9 Cush. 544. But the shore, or, properly speaking, the bank, remains unchanged. Worcester's & Webster's Dicts. *Shore.* Bouvier's Law Dict. *Banks of Rivers. Howard* v. *Ingersoll*, 13 How. (U. S.) 424. *Handly* v. *Anthony*, 5 Wheat. 383. *Halsey* v. *McCormick*, 3 Kernan, 296. The English cases are not of great weight here, under our different system of maintaining highways.

HOAR, J. The principles which must govern this case are sufficiently clear, though the application of them to various cases likely to arise, or at least which may be easily supposed, is not free from difficulty.

The question is, merely, What is the extent of the bridge which the Proprietors of the Connecticut River Bridge are bound to maintain by virtue of their franchise? In the absence of any express limits assigned to the bridge by the charter, or by the

laying out of the ways connecting with it, the rule must be sought in a fair interpretation of the language of the charter by reasonable implication. The charter authorizes the building a bridge over the Connecticut River from the western shore to Montague. The turnpike with which the bridge connected, and which has since been laid out as a public highway, was laid out originally so as to cross the river on the bridge; but without authority to take the franchise of the bridge company, and without attempting to occupy or control it; and its points of junction with the bridge were left wholly undetermined. Under these circumstances, the obligation of the defendants to maintain and repair the highway ends where the territory occupied by and belonging to the bridge company begins.

By *St.* 22 Hen. VIII. *c.* 5, the portions of highways which lie next adjoining to any ends of bridges distant from the said ends by the space of three hundred feet are to be repaired with the bridges; "one of them," in the words of Lord Coke, "as it were, depending upon the other." 2 Inst. 705, *n.* 10. This statute was considered, in *The King* v. *West Riding of York*, 7 East, 588, "as having specified the distance of three hundred feet from the ends of bridges, for the purpose of reducing to more convenient certainty what should in all cases thereafter be considered the extent and limit of this charge upon the county." Lord Ellenborough in that case observes, "I consider it as having been laid down long ago by Lord Coke, that the three hundred feet of highway at the ends of the bridge are to be taken as part of the bridge itself; being in the nature of the thing intimately connected with it, and the exact limits difficult in some cases to be ascertained, from the continuance of arches beyond the sides of the river. The *St.* of Hen. VIII. meant to define the limit which perhaps was uncertain at common law; but the statute still proceeds upon the assumption that there existed a common law liability for the county to repair the highways at the ends of the bridge as well as the bridge itself, as appendages to it."

It is not argued, nor is any evidence offered, that this rule was ever adopted as part of the common law of Massachusetts.

But the reason of the thing is certainly very much the same here as in England. Before a bridge is built, a road to the river, for the purpose of crossing, must connect with a ford or a ferry. In either case the road seeks the level of the water. But when the river is crossed by a bridge, the road must be adapted to the height of the bridge, and its form and dimensions will necessarily be dependent in some measure upon those of the bridge. Its level must be varied as the bridge is made higher or lower, so as to make the ascent or descent gradual and convenient. The approaches to a bridge must therefore to some extent be regarded as appendages to it, the right and the duty to make and maintain them being included in the franchise. Where there is nothing in the statute creating the franchise to define the extent of the bridge in this respect, it must be determined by what is reasonable under the circumstances of the particular case; and this may be fixed by the practical construction which has been applied in the exercise of the franchise by its owners, with the acquiescence of the public. That something more than the mere structure of wood, iron and stone is meant by a bridge is shown in the case of bridges which railroad companies are required to make and maintain where their roads cross public ways. *Parker* v. *Boston & Maine Railroad,* 3 Cush. 116. *Sawyer* v. *Northfield,* 7 Cush. 496.

In the case at bar, the fact that for many years the bridge company had been used to take the only care that was taken of the road for a certain distance at the ends of the bridge, and to make repairs upon it, is important and probably decisive, not on the ground of prescription, but as showing what had been practically regarded as the actual extent of the bridge. In the commentary of Lord Coke upon the statute of Henry VIII. before cited, he says : " *Nota,* if a bishop or prior, &c., hath at once or twice of almes repaired a bridge, it bindeth not; (and yet is evidence against him, untill he prove the contrary.)" 2 Inst. 700. And on a claim for damages for an injury caused by want of repair in a way or bridge, repairs made within six years are by our statute conclusive in fixing the liability of the person or corporation making such repairs for the maintenance of the same. Gen. Sts. *c.* 44, § 26.

Upon the other principal point in the case, we are of opinion that when a flood in a river has washed away a part of its banks, and so widened the bed of the stream, the obligation of a corporation having the franchise of a toll-bridge across the river to maintain and keep its bridge in repair, will require the extension of the bridge to the new bank thus created, if there is no other limitation of the franchise; and that this will carry with it a like duty in relation to the maintenance of the abutments and approaches to the bridge, to that which devolved upon the corporation when the bridge was first built. This conclusion must inevitably follow from the consideration that a bridge is to be built and maintained across the river, and that the extent of the duty is to be measured by the necessity arising from the changes in the river from time to time. In the case of the *Abbot of Combe*, Year Book 43, Assize, pl. 37, cited by Lord Ellenborough in the case in East before referred to, Knivet, J. said: " And although by the accretion of the water the ends shall be removed, yet you are bound to pursue the course of the water, and to repair the highway." A principle and result quite analogous are to be found in the decision in the recent case of *Child* v. *Boston*, 4 Allen, 41, upon the obligation of the city of Boston to maintain a common sewer emptying into the basin of the Back Bay. It was there held that, as the shore receded from the mouth of the sewer as first built, the city was bound to extend it, so as to secure the free discharge into the channel contemplated in its original construction.

It seems to have been assumed at the trial, either that this obligation to extend the bridge as the river widened did not exist, or that the facts proved did not show a widening of the Connecticut River. But this, we think, should have been submitted as a question of fact to the jury. It appeared that where the bridge joined the land the earth was swept away by the flood to a depth of fifteen or twenty feet, and that this cut was continuous from the edge of the bank as it formerly existed. It also appeared that all the earth was carried off down to the solid rock, so that a precipitous bank of earth was left at the termination of the road which remained, in a line with the general river bank

on that side, and with only a projecting point of rock beneath. We think it could not be said, as a matter of law, that these facts did not prove a change in the river bed by a widening which altered the bank.

One other point, upon which the defendants rely, cannot be supported. If they have neglected to repair a part of the road which it is their duty to maintain, it is no defence that this part would be of no immediate practical use, because the bridge company have also been guilty of a neglect of duty. Otherwise, if a bridge between two towns were carried away, neither of them could be compelled by indictment to restore its own share of the structure, and the public would be without a remedy.

*Verdict set aside and new trial granted.*